## Case No. 17,456.

WESTON et al. v. TRAIN et al.

[2 Curt. 49.] [1]

Circuit Court, D. Massachusetts.    Oct., 1854.

CHARTER PARTY—EMIGRANT PASSENGERS—LIABILITY FOR VICTUALLING—DETENTION AT PORT OF DISTRESS.

1. Construction of a charter-party for the conveyance of emigrant passengers; and the reciprocal rights and duties of the owners and charterers, growing out of a disaster on the voyage.

2. A charter party provided for the carriage of steerage passengers, "charterers to find bread stuffs, berths, water casks, water and fuel," etc. The charterer sold passenger tickets, which required the vessel to be victualled during the voyage, and during time of detention at any place, according to a scale subjoined to the ticket. This schedule contained items not mentioned in the charter party. *Held* that, as between charterers and owners, the charterers were liable, both for the articles of diet men-

[1] [Reported by Hon. B. R. Curtis, Circuit Justice.]

tioned in the charter party, and those not mentioned; and this both for the usual period of the voyage, and for the time of detention in a port of distress, through the springing of a leak during a gale.]

[3. The giving of a bond by the master conditioned to perform all the requirements of the British passenger act created no privity between the owners and passengers, and did not, as between owners and charterers, impose on the owners a liability for victualling.]

[4. The ship was liable, in such case, for the expense of landing and embarking the passengers at the intermediate port, and for housing them on shore, during the period of detention, while the ship was being repaired, this being a substitute for room on shipboard.]

[5. The charterers were liable for the reasonable and necessary cost of raising such money at the port of distress as was spent by the master for their account.]

[6. The law of average has no application to the expense of caring for and maintaining passengers at a port of distress.]

The charter-party on which this libel was founded, was as follows: "Memorandum for Charter. It is mutually agreed this day between Captain Weston, of the good ship or vessel called the 'Hope,' of the burden of nine hundred tons, now lying in the Port of Liverpool, whereof —— Weston is master, and Train & Co., of Liverpool, merchants and freighters of the other part. That said ship being tight, staunch, strong, duly provided with houses, ventilators, passengers' lanterns, and cabooses, and every way fitted for the voyage, shall, with all convenient speed, be made ready, and receive and take on board a cargo of lawful merchandise, and a full complement of steerage passengers (say, not less than a legal complement of heads), exclusive of infants. Charterers to find breadstuffs, berths, water casks, water, and fuel, and to pay the commutation money; the vessel to be loaded to seventeen feet six inches even keel, or equal thereto. Fourteen days, exclusive of Sundays, are to be allowed for loading, to commence on the vessel being in a proper loading stage berth (the time occupied in discharging the ballast not to be included in the lay days), and ready to commence loading in Waterloo or Victoria Dock, at the charterers' option. In all not exceeding what she can reasonably stow and carry over and above her cabin, tackle, apparel, provisions, and furniture, and being so loaded shall therewith proceed to Boston, United States of America, or so near thereunto, as she may safely get. and deliver the same agreeably to bills of lading, and so end the voyage (restraint of princes and rulers, the dangers of the seas and navigation, fire, pirates, and enemies during the said voyage always excepted). The passage money to be insured by charterers for and on account of the ship, against the risks incurred under clauses of the amended passenger act, passed 1849 [9 Stat. 399], the cost of which to be paid by the ship. The passengers to be admitted on board the vessel, if required by the charterers. at least two

days before the appointed day of sailing. And the said charterers do hereby promise and agree to load the said vessel with said cargo and passengers at Liverpool as herein stated, and also agree to pay freight as follows: For the hire of the vessel as above mentioned, the sum of twelve hundred and fifty pounds, with privilege of touching at Queenstown for passengers, charterers paying all expenses. The freight and primage, as per bills of lading, to the extent of this amount, to be taken in payment of four dollars eighty cents per pound, the deficiency, if any, to be paid in Liverpool, before sailing. less three months' interest. Demurrage if detained by either party beyond the above time, to be paid at the rate of six pounds, British sterling, per day, but the vessel not to be required to remain on demurrage longer than fifteen days; but if head winds prevail at the expiration of said lay days, preventing vessels of similar size and drafts from sailing, then the vessel to continue taking cargo and passengers to the extent herein named, without the charterers being liable to demurrage. The vessel to be consigned to Messrs. Enoch Train & Co., allowing them two and one half per cent. commission on the account of freight payable there. The ship to be discharged by consignees' stevedore, at Lewis's Wharf, or such other wharf as they may direct. Penalty for non-performance of this agreement, £500. Brokerage in Liverpool. five per cent. (Signed) Train & Co. G. B. Weston, Jr."

CURTIS, Circuit Justice. This is a libel in a cause of contract. certified into this court by the district court, because the district judge is related to one of the parties. The libel alleges that the respondents hired the ship Hope, belonging to the libellants, for a voyage from Liverpool to Boston, by a charter-party, a copy whereof is annexed to the libel. By the charter-party it is provided that the ship shall receive and take on board at Liverpool a cargo of lawful merchandise, and a full legal complement of steerage passengers. and proceed therewith to Boston. and there deliver them, dangers of the seas, &c. excepted. The ship was to be duly provided with houses, ventilators, passengers' lanterns, cabooses, and be in every way fitted for the voyage. The charterers were to find breadstuffs, berths. water casks, water, and fuel. and pay the commutation money of the passengers. It is further alleged in the libel. and appears in proof, that the charterers having put on board a large number of steerage passengers and a cargo of merchandise, the ship sailed from Liverpool. and in the course of the said voyage encountered a violent gale. and sprung aleak, which rendered it ne sary to put into the island of Fayal, where she was obliged to be hove down, and to discharge her cargo to make repairs, and was detained for the space of about one

hundred days; that the passengers could not, reasonably, and with a just regard to their health and safety, be kept on board the vessel while the ship was thus undergoing repairs, and were, therefore, necessarily landed; and that large expenses were incurred by the master in conveying the passengers to and from the shore, in supporting them, and providing nursing and attendance for the sick, and burial for the dead. It is also alleged in the libel, but denied by the answer, that the charterers were bound to bear these expenses, and the libel is filed to compel their payment. This presents a general view of the matters in issue between the parties. And, the main inquiry is, whether the charterers are liable, and if so, upon what ground, for a part, or the whole, of these expenses.

It is much to be regretted, that in contracting upon a subject-matter so peculiar, more care was not taken to define the respective liabilities of the owners and charterers by express stipulations in the contract, instead of leaving them to be worked out by the application of principles of law which were designed to govern cases distinguishable from this by important differences. But I must take the contract as I find it, and apply to it those rules of the maritime law which seem to me may be applicable, and thus arrive at the most satisfactory result in my power.

Before looking at the charter-party, it is important to have a clear view of the subject-matter of that instrument. Besides the carriage of a cargo of merchandise, which is the ordinary subject of one of those charter-parties, by which the charterer does not become owner for the voyage, this charter-party contemplates the transportation from Liverpool to Boston of a large number of emigrant passengers. These, together with their luggage, are to be put on board by the charterers, and carried for their profit. They were to occupy a part of the room on board the ship, and were to be conveyed therein, as the merchandise put on board by the charterers occupied another part of the space on board, hired by the charterers; but these passengers, no more than the merchandise, paid any thing to the owners of the ship. They paid to the charterers passage-money; and the charterers contracted with them to furnish to them and their luggage a passage, together with provisions and supplies. This contract between the charterers and each passenger, was evidenced by a ticket, delivered to each passenger by the charterers, pursuant to an act of the imperial parliament, by which the charterers engaged, that the holder shall be provided with a steerage passage to the port of Boston, in this ship Hope, together with not less than ten cubic feet for luggage, for each adult; and shall be victualled during the voyage and the time of detention at any place before its termination, according to a scale subjoined to the ticket. And it is expressly declared by the ticket, that the sum paid as passage-money includes government dues, and head-money at the

place of landing, and every other charge, except freight for excess of luggage. This was the relation between the passengers and the charterers; and it was persons standing in this relation to the charterers, and having these claims upon them, that the latter obtained by the charter-party a right to put on board the ship. Now it is obvious, that in the events which actually occurred, the passengers had a right to be supplied by the charterers, with all which the charterers had stipulated by the passage ticket, to provide for them. That ticket, in terms, covers a case of detention at any port, during the progress of the voyage. When they came on board, they came with that right. The first inquiry, then, must be, whether the charterers have, by the charter-party, imposed upon the owners of the ship, the performance of any and what part of the obligation to the passengers, which the charterers assumed by the passenger tickets. To a certain extent it is clear they have. According to the tickets, passengers were to be provided with a passage, and with supplies during .its continuance. By the charter-party the owners have stipulated to afford room on board, and that the ship should be so fitted and found with houses, ventilators, passengers' lanterns, and cabooses, as to be in a suitable condition to transport the passengers; and further, that the ship shall be properly victualled, manned, and officered, and sailed by them so as to make the voyage to Boston, dangers of the seas excepted. But the important question is, if the obligation of the ship-owners stops here. The charter-party contains a covenant by the charterers with the owners that the former will find breadstuffs, berths, water casks, water, and fuel. This does not cover all the articles embraced in the dietary scale subjoined to the passenger ticket, such as tea, salt, and sugar; and consequently the express terms of the charter do not make provision for the performance, by the owners, or by the charterers, or by both, of the whole contract with the passengers. And it will be found of much moment to inquire, on whom rested the burden of supplying these things. On the one side it may be urged that the owners of a ship, in which passengers are conveyed, are, prima facie, bound to supply the wants of the passengers on the voyage, and that this charter-party is framed upon that assumption, and an express covenant of the charterers inserted to restrict this duty of the owners; that so far as this covenant extends, the charterers are bound to provide for the passengers; but this obligation arises solely from their covenant, and cannot be extended beyond its terms. That if the charterers were liable to the owners for the supplies of the passengers generally, it would have been wholly unnecessary to insert a covenant to that effect; and that at all events, an express covenant to provide certain things, to the exclusion of others, impliedly negatives a liability for those other things not embraced in the covenant.

It must be admitted, there is great force in these suggestions. But, on the other hand, it may be answered, that the duty of owners to supply passengers arises from their contract with

the passengers, and from their payment of passage-money to the owners; that, in this case, the owners made no contract with the passengers, except through the charterers; that they only let to the charterers the vessel, for the transportation of merchandise and passengers, on the charterers' account, and for their profit; that the charterers were under an express contract with the passengers to supply them, as well as transport them in this vessel; that they have hired the vessel to enable themselves to perform one part of their contract only, that is, transportation; that all the arguments in favor of a restricted liability of the charterers, which can be drawn from the insertion of an express covenant by them to furnish certain articles to the passengers, apply with equal force in favor of the owners, because there is also inserted an express covenant by them to supply certain other specific things, to the passengers. I consider this answer satisfactory. It brings my mind to what I believe to be the truth of the case, that the charter-party, by inadvertence, did not make provision for the performance, either by the owners or the charterers, of the entire duty of the charterers to the passengers. That it made no provision for certain articles included in the dietary scale, and not embraced in the covenant of the owners, or of the charterers, nor for the just claims of the passengers during the detention which happened on the voyage. And, consequently, inasmuch as the duty of supplying the passengers was incumbent on the charterers, by reason of their contracts with the passengers, and as they have not imposed this part of that duty on the owners, by the charter-party, it remained upon the charterers, as between them and the owners. To apply these views to the different claims which are made, it is necessary to divide those claims into distinct classes. First. So far as the expenditures were for articles mentioned in the express covenant of the charterers, contained in the charter-party, or incurred for substitutes therefor, the charterers are liable for them. That covenant was not performed, by putting on board, before sailing, such quantities of those articles as were then thought sufficient. They were bound to find those things throughout the voyage, however long it might be protracted. Second. They are also liable for expenditures made at Fayal for any other articles embraced in the dietary scale, and for any substitutes therefor. Third. They are not liable for landing and embarking the passengers, or for housing them on shore, or for any expenses incurred in consequence thereof. These are substitutes for the room on shipboard, which the owners covenanted to furnish; and the passengers were landed, to enable the master to repair his vessel, and complete the voyage and earn his freight. Fourth. If there were any expenses beyond these (besides the cost of the bottomry bond), which the master was necessarily obliged to incur for the passengers, pursuant to a legal claim which the passengers had on him as the representative of the charterers under their contracts with the passengers, and which did not arise in consequence of the passengers being landed, they must be borne by the charterers. I believe these principles will enable the assessor to dispose of all the items except the cost of the bottomry bond.

In respect to the claim for the cost of raising money at Fayal, I am of opinion that the owners are entitled to be paid the reasonable and necessary cost of raising so much money there, as was spent by the master there on account of the charterers. Whether these funds could and ought to have been obtained at a less cost than was actually paid by the master, is a question to be passed on by the assessor, to whom the accounts will be referred. He will allow to the libellants the necessary and reasonable expenses, incurred on this account. I do not adopt, nor do I reject, the cost of the bottomry loan, as the standard to be applied to the case. If the master could reasonably have obtained the necessary funds in some other way, at a less expense, only that lesser expense is to be allowed. On the other hand, if he adopted a reasonable mode of raising the necessary amount, and paid no more for it than, under the circumstances, it was fairly worth, and had not the ability to raise funds there, on the credit of the owners, then the cost of the bottomry loan affords the proper rate of charge. I do not consider the owners of the vessel bound to send funds from hence to Fayal, to pay the charges which the charterers were bound to pay. These charges were their burden; and the master, in raising the money to pay them, acted for their account, and so far as he acted reasonably, the charterers are bound. Nor do I consider the charterers exempted from this charge by the failure of the owners to call upon the firm of Train & Co. here, to send funds to Fayal. If Train & Co. had admitted their liability for any part of these charges, the case would have been different. But having assumed the ground that the charterers were not liable at all, I have no reason to suppose they would have made any provision for funds in Fayal, if they had been requested to do so.

It was argued that, as the master, before sailing, gave a bond to the crown, conditioned to perform all the requisitions of the British passenger act, this placed him, and the owners, upon the same footing, as the passenger tickets given by the charterers. But I do not so consider it. The passenger tickets were evidences of an actual contract between the charterers and passengers, in consideration of the passage money received by the former from the latter. The bond is merely a security, required by positive law, for reasons of public policy, creating no privity between the owners and the passengers; it is founded on reasons of public policy, and not on any consideration received by the owners from the passengers; and is in its nature collateral to the actual contract between the passengers and charterers. I have not, therefore, allowed to the bond any weight, in considering the relative rights and duties of the owners and charterers.

It was also urged, that the clause in the charter-party respecting insurance, showed that the ship took the risks which caused the expenses

in question. The meaning of this clause is not clear; but I am not satisfied it has any bearing on this case. The best interpretation I have been able to place upon it is, that inasmuch as the owners and the master, by force of the British passenger act, might be subjected to expense, equalling the passage money, to send forward the passengers, in case of detention of the vessel at an intermediate port, for a longer period than six weeks, during the voyage, it was agreed that they should be insured against this risk at the cost of the ship. It may be, also, that there were other risks of a like kind, intended to be covered by such a policy. I have not thoroughly examined the passenger acts, to see what they were, if any: because it does not seem to me, that obtaining such insurance, against risks imposed by positive law, has any tendency to prove, that as between the owners and charterers, the former were to supply the passengers during the voyage or any part of it. The owners might well say, though it is your duty to supply the passengers, yet for reasons of public policy we are also made liable to do so by positive law; against the effects of this liability, we shall insure at our own cost, and you, as our agents, shall obtain the policy.

It was also insisted, that all the expenses incurred at Fayal on account of the passengers were general average charges. There can be no doubt, if the passengers had been so many bales of merchandise, the expenses incurred at a port of necessity, would have been general average charges. But as they were men, women, and children, who neither receive, nor contribute in general average, the law on that subject has no application to them, or to the expenses incurred in their behalf.

The case must be referred to an assessor to determine the amount which the libellants are entitled to recover upon the principles above declared.